UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

JAMES P. McGEE,

      Plaintiff,

v.

JAMES DUNN, individually,
CHRISTOPHER FOX, individually,
ROBERT BAGNAROL, individually,
BRIAN KARST, individually,
JOHN HARNEY, individually,
MICHAEL CAZZARI, individually, and
MICHAEL R. JOHNSON, individually,

      Defendants.

------------------------------------------X

            09 Civ. 6098 (FPS)

**MEMORANDUM OPINION AND ORDER
GRANTING THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.   Procedural History[1]

The plaintiff originally filed a complaint in the United States District Court for the Southern District of New York for violations of his constitutional rights.  Those alleged violations arose from a false arrest of the plaintiff for witness tampering in the fourth degree.  In his initial complaint, the plaintiff asserted claims against the following defendants: Ector Perez Galindo ("Galindo"); the Putnam County District Attorney's Office, Kevin Wright (collectively the "PCDA defendants"); Assistant District Attorney Robert Noah ("ADA Noah"); the Town of Carmel and the Carmel Police Department; the Carmel Police Officers

---

[1]For a more complete factual and procedural summary, see this Court's prior memorandum opinions and orders.  See, e.g., ECF Nos. 80 and 83.

Christopher Fox ("Fox"), John Doe, Detective Robert Bagnarol, Lieutenant Brian Karst, Sergeant John Harney, Lieutenant Michael Cazzari, and Chief Michael R. Johnson (collectively "the officer defendants"); and James Dunn ("Dunn") and J. Dunn Construction Corp. ("Dunn Construction").

According to the plaintiff, Dunn used his influence with the Carmel Police Department and the District Attorney's Office to have the plaintiff arrested.  Dunn allegedly did that to gain an advantage in civil litigation between Dunn and the plaintiff, which arose from a contract dispute about home improvement work that Dunn performed at McGee's residence.  The plaintiff alleges that the defendants were involved in a conspiracy to "do favors" for friends, including Dunn, and that this conspiracy led to the false arrest and malicious prosecution of the plaintiff.  The plaintiff brought his claim pursuant to 42 U.S.C. § 1983 ("§ 1983"), alleging civil rights violations caused by the defendants' conspiracy.  More specifically, the plaintiff alleged claims of (1) conspiracy by the defendants to violate his civil rights, (2) false arrest, and (3) malicious prosecution.

Later, the following defendants filed motions to dismiss: (1) Galindo; (2) PCDA defendants and ADA Noah; (3) the Town of Carmel and the Carmel Police Department; (4) the officer defendants; (5) Dunn Construction; and (6) Dunn.  Because Dunn filed for bankruptcy at that time, the claims against him were stayed until the

bankruptcy court lifted the automatic stay, pursuant to 11 U.S.C. § 362.  This Court entered a memorandum opinion and order granting the above-listed defendants' motions to dismiss, with the exception of Dunn.[2]  ECF No. 50.  Following that ruling, only the claim against Dunn remained.  However, the action against him was stayed until the bankruptcy court lifted the automatic stay.  Ultimately, Dunn filed a motion to dismiss, which this Court granted.  ECF No. 83.

The plaintiff then appealed those rulings to the United States Court of Appeals for the Second Circuit.  The Court of Appeals affirmed in part and vacated in part this Court's rulings.  ECF No. 93.  The Court of Appeals affirmed this Court's rulings regarding: (1) dismissal of claims against Galindo; (2) dismissal of claims against the PCDA defendants and ADA Noah; and (3) dismissal of the malicious prosecution claim as to all defendants.  Further, the Court of Appeals found that the plaintiff abandoned the claim against Dunn Construction.

The Court of Appeals, however, disagreed with three rulings by this Court, and accordingly vacated them.  First, regarding the claims against Dunn, the Court found that the plaintiff

---

[2]Specifically, this Court dismissed the claims against Galindo because the plaintiff failed to sufficiently plead that Galindo conspired with the state actors as required under a § 1983 claim. Regarding the officer defendants, the Town of Carmel and the Carmel Police Department, this Court dismissed the claims against them due to qualified immunity.  Finally, concerning Dunn Construction, this Court granted its motion to dismiss.

sufficiently stated a claim against Dunn for a § 1983 conspiracy. Second, the Court of Appeals vacated the dismissal of the claims against the officer defendants.   Third, the Court of Appeals vacated this Court's denial of the plaintiff's initial motion to amend the complaint.   The Court of Appeals, however, stated that the plaintiff was not permitted to reinstate any claims against any party whose dismissal was affirmed by the Court of Appeals.  Also, the Court of Appeals stated that the complaint could not be amended to add Putnam County as a party because the complaint failed to sufficiently state that it violated any of the plaintiff's rights.

To summarize the results of the appeal, the following judgments were vacated in part: (1) the dismissal of the claims against Dunn; (2) the dismissal of the claims against the officer defendants; and (3) the denial of the motion to amend the complaint.   However, the following rulings were affirmed: (1) dismissal of the malicious prosecution claim as to all defendants; (2) the dismissal of claims against Galindo; (3) the dismissal of claims against the District Attorney's Office, Wright and ADA Noah; and (4) the dismissal of claims against Dunn Construction.   The plaintiff ultimately filed a second amended complaint which complied with the mandate of the Court of Appeals.   ECF Nos. 124-26.  That amended complaint states the following claims against the remaining defendants: (1) conspiracy to violate the plaintiff's

civil rights by Dunn and the officer defendants, and (2) false arrest by the officer defendants.

At issue now are the following motions: (1) defendant Dunn's motion for summary judgment and (2) the officer defendants' motion for summary judgment.  ECF Nos. 143 and 147, respectively.  For the reasons discussed below, both Dunn and the officer defendants' motions for summary judgment must be granted.[3]

## II.  Facts

Pursuant to three construction contracts, the plaintiff and his wife hired Dunn to perform work on their house.  On or about May 19, 2005, Dunn collected his tools and left after a dispute arose regarding those contracts.  Later in 2005, the plaintiff suffered extensive water damage to his home during a storm.  After filing a claim with his insurance carrier, Liberty Mutual, the senior insurance inspector determined that the water damage was due to the faulty installation of the roof by Dunn in May 2005.  Liberty Mutual paid the plaintiff for the ceiling damage and then attempted to pursue a subrogation action against Dunn for reimbursement.  The plaintiff then brought a small claims action

---

[3]On December 7, 2015, the parties by counsel filed a letter, construed as motion, wherein they request that the current deadlines be "adjourned until after the court renders its decision on the pending summary judgment motions."  ECF No. 168.  A second letter dated December 14, 2015 (not docketed), from other counsel but on behalf of all parties made a similar request.  Because this Court grants the motions for summary judgment, the parties' letter motions are DENIED AS MOOT.

against Dunn in the Town of Carmel Justice Court regarding one of the three construction contracts.   Subsequently, Dunn filed a counterclaim against the plaintiff, and the plaintiff then brought a second small claims action in that court regarding a second of the three construction contracts.[4]

Because the amount of damages related to his two small claims actions in the Town of Carmel Justice Court exceeded the subject matter jurisdiction of that court, the plaintiff withdrew his two small claims actions in order to commence an action in the New York State Supreme Court.   However, the trial of Dunn's counterclaim proceeded in small claims court.   Dunn's counterclaim was tried in the Town of Carmel Justice Court, with the plaintiff proceeding pro se.   By decision and order dated November 29, 2005, Judge James Reitz found in the plaintiff's favor and dismissed Dunn's counterclaim in its entirety.   On December 20, 2006, the plaintiff brought a civil action against Dunn in the New York State Supreme Court as to all three contracts.   This action was ultimately concluded by way of a settlement agreement.

Over the course of the litigation described above, Dunn notified the plaintiff that Galindo[5] may be called as a potential

---

[4]The plaintiff also brought a consumer complaint before the Dutchess County Department of Consumer Affairs ("DCDCA") regarding one of the three contracts that he had entered into with Dunn, but the DCDCA determined that the matter was beyond its scope.

[5]Galindo worked as a cook at a local restaurant, and was also allegedly employed by Dunn as a day laborer doing home improvement

witness in such litigation.   ECF No. 144 Exs. A and F.   The
plaintiff contacted Galindo in order to obtain his address for
Liberty Mutual on April 6, 2006.   Id. Ex. E.   In the course of that
phone call, however, the plaintiff informed Galindo that the
request for Galindo's address related to Dunn's dispute concerning
the water damage.   Id. Exs. E and F.   Dunn, with the aid of his
attorney, asked Galindo to provide an affidavit as to what Galindo
witnessed on the date of the incident that sparked the contract
dispute.   In the affidavit, which Galindo completed on March 21,
2007, he stated that the plaintiff called him a second time around
11:00 p.m.   During that phone call, the plaintiff allegedly stated
the following to Galindo: (1) "Do you know that Jaime [Dunn] is
using your name as a witness?"; (2) "They are going to ask you
about your residence and if you are legal here in America"; and (3)
"The court is going to ask you if you are here legally and if your
[sic] not, you will be in trouble."   Id. Ex. I.   According to the
affidavit, Galindo responded "I told him I have my own problems and
leave me alone and hung up."   Id.   Defendant Dunn and his attorney
both learned of the plaintiff's phone call for the first time when
Galindo came to the attorney's office to complete the affidavit.
Id. Ex. G.

   After learning about the phone call, Dunn pointed out to
Galindo that the plaintiff's conduct may have been illegal.

---

work.

Galindo then asked what could be done about it.  Dunn informed Galindo that Galindo could file a voluntary statement with the Carmel Police Department.  Galindo, on his own accord, decided to go to the Carmel Police Department in order to file a voluntary statement on March 27, 2007.  Dunn accompanied him to the police department so as to show him where he could file such statement. Other than accompanying him to the police department's main entrance and window, Dunn did not enter or join Galindo inside the police department.  Id. Ex. G at 39 (Galindo stating that "No. I didn't see [Dunn] inside [the police department], no.  He was outside.  [Dunn] never went inside.").  While at the main entrance of the police department, Dunn informed Harney, who was the liaison to the District Attorney's office, about why he and Galindo were at the police department.  Following that conversation, Harney talked to ADA Noah about the plaintiff's telephone call to Galindo.  After their conversation, Fox was called from patrol to meet with Galindo regarding his voluntary statement.  ECF No. 135 Ex. L.  Fox had met Dunn for the first time on the day that Dunn escorted Galindo to the police department.  Id. Ex. K.  After arriving at the police department, Fox interviewed Galindo in an interview room located in the back of the department building.  Fox was the only individual present when Galindo filled out the voluntary statement.[6]  Id. Ex.

---

[6]Although an interpreter was not present, neither the record nor Galindo indicates that Galindo failed to understand the questions asked during his interview.

11.   The voluntary statement stated the following by Galindo: "McGee calls me around 11 p.m.  I think he try to scare me if I go to court to testifying.  Because he ask me if I was citizen or legal in USA."  Id. Ex. S.

Based on Galindo's voluntary statement, Fox arrested the plaintiff for tampering with a witness in the fourth degree. Defendant Fox, and only Fox, decided to arrest the plaintiff.  Id. Ex. K at 94 (Q: "To your knowledge, you were the only person who determined to arrest [the plaintiff], right?"  A [Def. Fox]: "Yes."); see id. Ex. J (Defendant Harney stating that Fox was "the one who made the final determination" to arrest the plaintiff.). More specifically, on the same day that Galindo filed the voluntary statement, Fox left messages on plaintiff's business answering machine directing him to come down to the police station for processing, or else a warrant would be issued for his arrest. Nonetheless, it was Galindo's voluntary filing of the statement against the plaintiff that brought about the false arrest and malicious prosecution claims at issue in this case.

On March 30, 2007, the plaintiff voluntarily reported to the police station with his counsel at the time, Darren Fairlie ("Mr. Fairlie").  On April 4, 2007, Galindo was asked to return to the police department for a second interview regarding his voluntary statement.  Defendant Bagnarol, a detective at the time, conducted the interview.  Bagnarol asked essentially the same questions as

9

those from Galindo's first interview with defendant Fox.[7]  ECF No. 142 Ex. D at 46-47.

The plaintiff's counsel at the time, Mr. Fairlie, sent the police department a letter on approximately April 2, 2007.  ECF No. 142 Ex. G at 8.  In that letter, Mr. Fairlie claimed that the plaintiff did not receive access to his attorney (Mr. Fairlie), that the plaintiff was illegally interrogated, and that the plaintiff was being coerced into waiving his rights under Miranda v. Arizona, 384 U.S. 436 (1966).  Defendant Johnson, as the Chief of Police in Carmel, had an investigation conducted by Karst into the claims of the letter.  Id. at 11.  After investigating the matter, including video footage of the incident involving Mr. Fairlie's claims, Karst concluded that Mr. Fairlie's claims lacked merit.  Defendant Karst then contacted Mr. Fairlie as to his findings.  Mr. Fairlie "thanked" Karst for conducting the investigation, and after their phone call, "that was the last [defendant Karst] heard of those specific complaints."  ECF No. 142 Ex. G at 38.  Ultimately, on January 14, 2008, the tampering charge against the plaintiff was dismissed, and the court found "no credible evidence that at the time of the alleged phone

---

[7]Galindo also states that defendant Dunn did not tell him to go back to the police department, and that defendant Dunn was not present at the police department during that second visit.  ECF No. 142 Ex. D at 46-47.

conversation that there was any pending action or proceeding." ECF No. 124 ¶ 55.

Based on the facts above, the plaintiff contends that the defendants conspired to violate the plaintiff's civil rights by falsely arresting the plaintiff.  The point of that conspiracy was to help defendant Dunn in his prior litigation against the plaintiff regarding the construction contracts.

### III.  Applicable Law

Under Rule 56(c) of the Federal Rules of Civil Procedure,

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
   (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or
   (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999).  However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides

11

that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." 477 U.S. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also McPherson, 174 F.3d at 280; Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996)("While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial.")(internal citations and quotations omitted).

In Celotex, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the supported underlying facts, all inferences must be

12

viewed in the light most favorable to the party opposing the motion. <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## IV.   <u>Discussion</u>

As discussed earlier, defendant Dunn and the officer defendants each filed a motion for summary judgment. Further, the remaining claims in this civil action are the following: (1) conspiring to violate the plaintiff's civil rights by Dunn and the officer defendants; and (2) false arrest by the officer defendants. The defendants' motions for summary judgment are discussed below in the order presented.

### A.   <u>Motion for Summary Judgment by Defendant Dunn</u>

Dunn asserts two[8] main arguments in his motion for summary judgment. First, he argues that he is not a state actor, and therefore cannot be liable under § 1983. Second, he contends that he maintained little, if any, relationship with the officer defendants. That limited relationship and lack of supporting evidence demonstrates that (1) Dunn did not conspire with any state actor, and (2) no meeting of the minds existed between Dunn and the officer defendants. In opposition to Dunn's motion, the plaintiff

---

[8]Defendant Dunn also claims that the plaintiff violated Local Rule 56.1(b) in his response by failing to provide concise counter-statements and by failing to attach cited exhibits. Based on those alleged violations, he requests that this Court strike such counter-statements. Because Dunn's motion for summary judgment is granted on the present record, this Court finds it unnecessary to address this argument.

claims that the record shows an "intimate involvement [among the defendants] in the arrest and prosecution of plaintiff."  The plaintiff points to the record, and claims that the facts show defendant Dunn played a pivotal role in orchestrating the alleged conspiracy.  In addition to explicitly orchestrating a conspiracy, the plaintiff also invokes the collective knowledge doctrine. Applying that doctrine to the officer defendants, the plaintiff believes that the officer defendants knew of the contract litigation between defendant Dunn and the plaintiff, thus demonstrating their participation in Dunn's conspiracy.

"Section 1983 addresses only those injuries caused by state actors or those acting under color of state law." <u>Spear v. Town of West Hartford</u>, 954 F.2d 63, 68 (2d Cir. 1992) (citing <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 835 (1982)).  A claim against a private actor under a § 1983 conspiracy theory requires that the plaintiff demonstrate that the private actor "acted in concert with the state actor to commit an unconstitutional act." <u>Ciambriello v. County of Nassau</u>, 292 F.3d 307, 324 (2d Cir. 2002).  Phrased another way, the acting "under color" of state law requirement under § 1983 "does not require that the accused be an officer of the State.  It is enough that he is a willful participant in a joint activity with the State or its agents." <u>United States v. Price</u>, 383 U.S. 787, 794 (1966).  Conferring "state action" upon the actions of a private actor can be shown by "plan, prearrangement, conspiracy,

custom, or policy[.]" Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341 (1st Cir. 1995); see Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 273 (2d Cir. 1999).

As to the specific elements of a § 1983 conspiracy claim, the plaintiff must show the following: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (citing Carson v. Lewis, 35 F. Supp. 2d 250, 271 (E.D.N.Y. 1999)) (internal citations omitted). Therefore, the plaintiff must show that the state actor and private actor possessed a "meeting of the minds," and thus "reached an understanding that" the plaintiff's civil rights should be violated pursuant to their action. Adickes, 398 U.S. 144, 158 (1970). Merely providing conclusory allegations that a private actor "acted in concert with a state actor, however, does not suffice to state a § 1983 claim" against the private actor. Ciambriello, 292 F.3d at 324 (citing Spear, 954 F.2d at 68).

In this case, the plaintiff alleges that Dunn conspired with the officer defendants to violate the plaintiff's civil rights. Allegedly, Dunn sought to gain an advantage in the contract dispute between he and the plaintiff. In order to assess whether defendant Dunn and the officer defendants reached a "meeting of the minds," this Court will examine each officer defendants' alleged role in

15

Dunn's conspiracy.  As will be shown below, the plaintiff's allegations are conclusory at best, and therefore, fail to satisfy the legal standard as set forth above.

1. <u>Defendant Christopher Fox</u>

In the complaint, the plaintiff alleges that Fox acted on behalf Dunn by agreeing to arrest the plaintiff.  The plaintiff claims that when Galindo went to file his complaint against the plaintiff, defendants Dunn, Harney, and Fox directed Galindo to do so.  The plaintiff makes similar allegations throughout his response in opposition.  Those allegations, however, are insufficient to satisfy the legal standard discussed above.

The record shows that Fox independently decided, without approval or orders from anyone else, to arrest the plaintiff.  When asked if he was "the only person who determined to arrest [the plaintiff]," Fox answered "Yes."  ECF No. 135 Ex. K at 94.  When asked if anyone "else participated in making that determination," he answered "No."  <u>Id.</u>  More dispositive than the above statements, however, is the lack of any relationship or agreement between defendants Dunn and Fox that demonstrates a "meeting of the minds." In his deposition, Fox was asked if "[p]rior to March 27, 2007, had anybody indicated to you, in words or substance, there was any litigation or lawsuit between James Dunn and Mr. McGee," to which he responded "No."  <u>Id.</u> at 91.  Moreover, it is undisputed that defendant Fox "is not now and has never been a friend of Dunn."

16

ECF No. 155 ¶ 10.  Galindo also stated in his deposition that defendant Dunn did not accompany him into the police department, let alone the interview room where Galindo presented his statement to Fox.  ECF No. 135 Ex. G at 21.  Defendant Fox was the only individual present with Galindo when Galindo provided his statement regarding the plaintiff's phone call.  As to deciding whether to provide that voluntary statement, neither the record nor the plaintiff demonstrates that Dunn directed or advised Galindo to submit such a statement.

The plaintiff claims that Fox was part of the conspiracy, which Dunn sought to form, to obtain an advantage for Dunn in his ongoing contract dispute with the plaintiff.  Without knowledge of either the contract litigation or who defendant Dunn was, and without outside direction to arrest the plaintiff, it is clear Fox did not conspire with Dunn to arrest the plaintiff.  As stated earlier, the plaintiff needs to show that "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Pangburn, 200 F.3d at 72 (internal citations omitted).  Here, the plaintiff fails to satisfy even the first element of his § 1983 conspiracy claim.  The plaintiff provides only conclusory allegations that Dunn, as part of the conspiracy, ordered Fox to arrest the plaintiff.  As the record shows, those

17

allegations are easily disproved, and the plaintiff offers insufficient evidence, if any, to conclude otherwise or show a genuine issue of material fact.

> 2. <u>Defendant Robert Bagnarol</u>

As to Bagnarol, the plaintiff alleges the following: (1) that Bagnarol was a friend of Dunn; (2) that he agreed to interview Galindo a second time; and (3) that Bagnarol interviewed Galindo in order to bolster the legal sufficiency of Galindo's voluntary statement. ECF No. 124 ¶ 6. By attempting to cure Galindo's allegedly deficient complaint, the plaintiff contends that Bagnarol joined in the conspiracy to falsely arrest the plaintiff and thereby violate his civil rights.

The record and facts, however, show no such conspiratorial participation, let alone a "meeting of the minds." In his deposition, Bagnarol points out that he only met Galindo one time, on April 4, 2007, for purposes of the second interview. ECF No. 142 Ex. F at 10. As to Dunn, Bagnarol noted that other than greeting Dunn once remotely in the past and outside the police department building, he could not remember any conversations between them. <u>Id.</u> at 37 (Q: "Did you have a conversation with [defendant Dunn]?" A [Bagnarol]: "No."). Indeed, Dunn's counter-statement confirms that it is undisputed that defendants Dunn and Bagnarol are "not now and [have] never been [] friend[s]." ECF No. 155 ¶ 11. Aside from the plaintiff's allegations of conspiracy

18

between defendants Dunn and Bagnarol, he offers no evidence in support of those allegations.  Such conclusory statements do not satisfy the legal standard discussed above.  Thus, the plaintiff has not shown a "meeting of the minds" between defendants Dunn and Bagnarol.

    3.  <u>Defendant Brian Karst</u>

    The record shows that Karst conducted an investigation into the claims by Mr. Fairlie, the plaintiff's counsel at the time of arrest.  As stated earlier, Mr. Fairlie sent the police department a letter on approximately April 2, 2007.  ECF No. 142 Ex. G at 8. In that letter, Mr. Fairlie claimed that the plaintiff did not receive access to his attorney (Mr. Fairlie), that the plaintiff was illegally interrogated, and that the plaintiff was being coerced into waiving his rights under <u>Miranda v. Arizon</u>a, 384 U.S. 436 (1966).  Defendant Johnson, as the Chief of Police in Carmel, had an investigation conducted by Karst into the claims of the letter.  <u>Id.</u> at 11.  After investigating the matter, including video footage of the incident involving the alleged claims, Karst concluded that Mr. Fairlie's claims lacked merit.  Defendant Karst then contacted Mr. Fairlie as to his findings.  Mr. Fairlie "thanked" defendant Karst for conducting the investigation, and after their phone call, "that was the last [defendant Karst] heard of those specific complaints."  <u>Id.</u> at 38.

In his complaint, the plaintiff alleges that Karst falsely claimed that he investigated the plaintiff's arrest. It is alleged that, as a member of the conspiracy, Karst conducted a "sham" investigation. ECF No. 124. Because his actions were in furtherance of the conspiracy, the plaintiff believes that Karst violated the plaintiff's rights. Nothing in the record substantiates the plaintiff's conspiracy claim as to defendants Dunn and Karst, or at least raises a genuine issue of material fact about the same. Although Karst knew of defendant Dunn, Karst stated that "I wouldn't call [defendant Dunn] a friend. I just knew of him from the town. I never associated with him. I never ate dinner with him, never socialized with him." Id. at 56. It is also undisputed by the parties that defendant Karst was "not now and has never been a friend of Dunn." ECF No. 155 ¶ 9. Other than asserting that defendants Dunn and Karst were friends as stated in the complaint, the plaintiff offers no evidence to show an agreement or "meeting of the minds" between the two. The law is quite clear that merely providing conclusory allegations that a private actor "acted in concert with a state actor, however, does not suffice to state a § 1983 claim" against the private actor. Ciambriello (citing Spear, 954 F.2d at 68). Here, the plaintiff provides only conclusory allegations, and thus fails to state a § 1983 claim.

As to the allegation that the investigation was a sham, the record also does not support that claim. Rather, defendant Karst pointed out that he investigated the issues asserted by Mr. Fairlie as to the plaintiff's arrest. That investigation included assessing a video that captured the interaction between the plaintiff and Fox. The interaction formed the basis of Mr. Fairlie's complaints, and Karst found those complaints were inconsistent with what was captured by the video. ECF No. 142 Ex. G at 38. Karst contacted Mr. Fairlie as to his findings. Id. Nothing in the record indicates that the investigation was conducted either as a sham or in bad faith, and the plaintiff offers nothing that contradicts the record before this Court. The plaintiff has neither satisfied the legal standard for his § 1983 conspiracy claim against Dunn nor shown that genuine issues of material fact exist.

    4.  <u>Defendant John "Jack" Harney</u>

    The plaintiff argues that triable issues of fact remain as to defendant Harney's involvement in the alleged conspiracy. In the complaint and response, the plaintiff contends that Harney essentially acted as "Dunn's police liaison." ECF No. 154 at 7. The plaintiff points to a conversation that defendant Harney and ADA Noah had concerning the voluntary statement filed by Galindo.[9]

---

[9]As mentioned earlier, defendant Harney was the detective sergeant for the Carmel Police Department, and acted as a liaison between the department and District Attorney's office. ECF No. 142

The plaintiff relies primarily on portions of the conversation between defendant Harney and ADA Noah to prove that defendant Harney conspired with defendant Dunn.   The conversation occurred after Galindo provided his voluntary statement but before the plaintiff's arrest.   In the conversation, the plaintiff points to two key portions: the reference to a "plan" and the alleged presence of Dunn at the police department.   ADA Noah and Harney stated the following:

> **Sergeant Harney:** **I've got James Dunn down here**[.] . . .
> **Sergeant Harney:** [Dunn]'s got a pretty good booklet of that four or five different -- actually more than that statements that --
> **Mr. Noah:** Statements.
> **Sergeant Harney:** -- he sworn [sic] statements that could be proved to be sworn false statements in court.  What I had suggested is we wait until that civil proceeding is done, and then we could follow up on that and determine whether or not that they were proved to be false statements.  But we're -- he's going to get copies of everything by Thursday, and I'm going to include all of those, because it'll give a motive as to why this guy was trying to get [Galindo] to absent himself from that hearing.
> **Mr. Noah:** **"Sounds like a plan."**

ECF No. 142 Ex. H at 14-17 (emphasis added).   Based on those portions of the conversation, the plaintiff believes that "it is obvious that Harney was actively engaged in a dialogue with Dunn regarding alternative criminal prosecutions for Plaintiff.   It is equally evident that Harney engaged in that dialogue before the date of Plaintiff's arrest."   The plaintiff also believes that

---

Ex. H at 25.

Galindo used the affidavit he swore out at the office of Marin, Dunn's prior counsel, as a "script" for his voluntary statement. In addition to using it as a script, the plaintiff contends that defendant Dunn provided Harney with the affidavit in furtherance of the conspiracy to falsely arrest the plaintiff.

After reviewing the record and facts, it is clear that the plaintiff's arguments are conclusory at best. Regarding the transcript, that conversation fails to show that a conspiracy existed between defendants Dunn and Harney. Harney was asked about the phrase "I've got James Dunn down here," to which he stated "I don't recall him being with me at the time, physically, no." ECF No. 142 Ex. H at 19. The plaintiff believes that Harney's statement means that Dunn was at the police department and in the interview room with Galindo. In addition to defendant Harney's statement, however, the record contradicts the plaintiff's belief. Galindo stated in his deposition that Dunn did not accompany him into the police department beyond the main entrance, let alone the interview room where Galindo gave his statement to Fox. ECF No. 135 Ex. G at 21. Fox was the only individual present with Galindo when Galindo provided his statement regarding the plaintiff's phone call. Defendant Dunn only escorted Galindo to the police department, and the plaintiff offers no evidence to show that Dunn coerced, forced, or advised Galindo to provide a voluntary statement.

23

As to the reference to a "plan," the evidence does not support the argument that the word "plan" referenced an alleged conspiracy. Rather, the record shows that Harney had little involvement with the case against the plaintiff.   Fox, and no one else, made the decision to arrest the plaintiff.   When asked about his involvement of the case, Harney stated the following: "This -- the only dealings I had with this case were within this general, you know, few minutes.   This wasn't my case.   This was handled by Officer Fox; so, no, I didn't.   This [case] was followed-up on by another police officer."   ECF No. 142 Ex. H at 25.   Counsel for the plaintiff then asked Harney the following: "If you had so little to do with this case, why did you have the conversation with Noah?", to which Harney answered "I am the liaison to the [District Attorney's] office.   That's my job as detective sergeant."   Id. When asked whether he spoke to Fox about the plaintiff's arrest, Harney responded "No.   I never did." Id. at 58.   Defendant Harney further stated that he could not recall an instance when Dunn stated to him the following: (1) that he and the plaintiff maintained pending litigation concerning a contract dispute; (2) that he wanted the plaintiff arrested or prosecuted; or (3) that he wanted the plaintiff jailed.   Id. at 73.

The record shows that Harney only learned about the contract dispute between Dunn and the plaintiff when Galindo filed his voluntary statement, which was partially determined by inferring

Galindo's statement about a trial.  See id. at 49 and 52.  Prior to that occurrence, Harney only knew that Dunn "[s]aid he got thrown off his job [for the plaintiff]."  Id. at 50.  That statement was made when Dunn added a master bedroom to Harney's home in 2005.  Id. at 38.  Other than that interaction, Harney and Dunn were at most friends of friends.  The facts above, and the record in its entirety, shows that the reference to a "plan" in no way insinuated or referred to an alleged conspiracy.  To connect the above isolated references from Harney's conversation with ADA Noah to a conspiracy with defendant Dunn is a stretch, to say the least.  Similar to most of plaintiff's arguments, only conclusory allegations are offered in support of the conspiracy claim between Dunn and Harney.  That statement fails to demonstrate a meeting of the minds or any such agreement.

In addition to the conversation discussed above, the plaintiff believes that Dunn gave Harney the affidavit given by Galindo "in an attempt to find a pending case or proceeding which could be linked to plaintiff's dateless phone call."  ECF No. 154.  That argument fails for two reasons.  First, it is somewhat unclear whether Dunn gave Harney the affidavit.  Second, even if defendant Harney received the affidavit, that fact has no bearing on Fox's decision to arrest the plaintiff.  The record shows that Fox decided to arrest the plaintiff, and that decision was made by him alone.  The plaintiff offers no evidence, other than bald

assertions, that Harney actively participated in or engaged in the
arrest of the plaintiff, let alone a conspiracy.  Therefore, the
plaintiff has not satisfied the legal standard previously discussed
because he failed to demonstrate "an agreement between two or more
state actors or between a state actor and a private entity," in
addition to the remaining elements.  <u>Pangburn</u>, 200 F.3d at 72
(internal citations omitted).  Moreover, the plaintiff has not
shown that genuine issues of material fact exist.

     5.  <u>Defendant Michael Cazzari</u>

The plaintiff alleged in his complaint that Cazzari destroyed
certain evidence in furtherance of the conspiracy.  ECF No. 124
¶ 9.  At defendant Cazzari's deposition, however, counsel for the
plaintiff suggested that counsel for the officer defendants prepare
a stipulation of discontinuance for Cazzari.  ECF No. 142 Ex. C at
39-40; ECF No. 140.  However, the record does not show that such a
stipulation was filed as part of the docket.

To the extent that any claims of conspiracy remain against
defendant Cazzari, the record shows that such claims lack merit.
At his deposition, Cazzari pointed out the following: (1) that he
has never met or spoken to Galindo; (2) that he was never "involved
in an investigation, of any aspect, in the arrest or processing of"
the plaintiff; (3) that he has never met or spoken to Dunn; and (4)
that he did not learn of the contract dispute between Dunn and the
plaintiff until speaking with his attorney as to the above-styled

civil action.  ECF No. 142 Ex. C. at 7, 15 and 26 (respectively).
Further, it is undisputed that Cazzari has never met Dunn.  ECF No.
155.  It is difficult to form a meeting of the minds without having
met.  The record shows that Cazzari had little, if any, involvement
in the dispute between Dunn and the plaintiff.  Therefore, the
plaintiff has not met his burden as to the conspiracy claim against
defendants Dunn and Cazzari, and he has not shown that genuine
issues of material fact exist.

6.  <u>Defendant Michael R. Johnson</u>

Defendant Johnson served as the Chief of Police during the
time that the alleged conspiracy occurred.  The plaintiff argues
that Johnson ignored the complaints that Mr. Fairlie, the
plaintiff's counsel at the time of arrest, raised in the letter to
the police department.  ECF No. 154 at 10.  By intentionally
ignoring that letter, the plaintiff argues that Johnson aided the
defendants in furtherance of the conspiracy.

As stated earlier, Mr. Fairlie submitted a letter to the
police department.  ECF No. 152 Ex. 10.  In that letter, Mr.
Fairlie claimed that defendant Fox refused Mr. Fairlie access to
the plaintiff, attempted to interrogate the plaintiff, and
attempted to coerce the plaintiff to waive his <u>Miranda</u> rights.  <u>Id.</u>
The plaintiff also asserted that defendant Dunn sought to use his
"personal relationships within the Town of Carmel Police Department
to unlawfully use the criminal justice system to obtain an

advantage over [the plaintiff] in a civil dispute." Id.  The plaintiff then concluded his letter with a description of the elements of tampering with a witness in the fourth degree, and that the plaintiff's conduct failed to amount to such offense.  Id. Defendant Johnson directed Karst to conduct an investigation of the claims asserted by Mr. Fairlie.  As stated earlier, Karst conducted such investigation and found evidence, including video footage, that directly contradicted Mr. Fairlie's claims.  However, the plaintiff now believes that Johnson furthered the conspiracy by "ignoring" Mr. Fairlie's claim that Dunn improperly conspired with the police department.

After reviewing the record and the filings, it is clear that the plaintiff's argument as to Johnson lacks merit.  The plaintiff baldly claims that Johnson participated in this conspiracy by ignoring Mr. Fairlie's letter.  The facts show a different story. Upon receipt of the letter, Johnson had Karst conduct an investigation into the claims concerning a waiver of Miranda rights, illegal interrogation, and obstructing access to counsel. Defendant Karst conducted an investigation, and found a video of the plaintiff's arrest that refuted Mr. Fairlie's accusations.  The plaintiff also contends that Johnson did not directly respond to the claims of Dunn's conspiracy within the police department. Therefore, the plaintiff believes that "by refusing to investigate these critical aspects of counsel's letter, [defendants Johnson and

28

Karst] and the Department knowingly advanced Dunn's plan to have Plaintiff prosecuted." ECF No. 154. The record, however, does not support that belief. After conducting an investigation into Mr. Fairlie's claims, Karst informed him of his findings. Further, Johnson was asked if "anyone on behalf of Dunn [told him] that Dunn wanted [the plaintiff] arrested, prosecuted and jailed." ECF No. 142 Ex. I at 65. He answered "No." Id. Further, defendant Johnson was asked if "[p]rior to the arrest, did [he] ever speak with James Dunn about Galindo," and if he ever spoke "with James Dunn prior to the arrest with respect to [the plaintiff]." ECF No. 135 Ex. P. at 12. Defendant Johnson responded "No" to both questions. Id. Based on the facts discussed above, the record shows no evidence of an agreement, let alone a conspiracy between Dunn and Johnson. Other than conclusory and misguided assertions, the plaintiff provides insufficient evidence, if any, to either satisfy the legal standard described above, or at least show the existence of genuine issues of material fact.

   7. Collective Knowledge Doctrine Does Not Apply

   To the extent that the plaintiff attempts to invoke the collective knowledge doctrine, such an attempt is without merit. Here, the plaintiff believes that pursuant to the doctrine, the officer defendants were aware of Dunn and the plaintiff's ongoing contract dispute. Because the officer defendants knew of such dispute, they were aware of defendant Dunn's conspiracy and

29

actively participated in furtherance of it.  However, the
collective knowledge doctrine does not apply in this case.  The
doctrine applies when, "for the purpose of determining whether an
arresting officer had probable cause to arrest, 'where law
enforcement authorities are cooperating in an investigation . . .
the knowledge of one is presumed shared by all.'"  <u>Savino v. City
of New York</u>, 331 F.3d 63, 74 (2d Cir. 2003) (quoting <u>Illinois v.
Andreas</u>, 463 U.S. 765, 772 n.5 (1983)).  The purpose behind the
doctrine is that "'in light of the complexity of modern police
work, the arresting officer cannot always be aware of every aspect
of an investigation; sometimes his authority to arrest a suspect is
based on facts known only to his superiors or associates.'"
<u>Savino</u>, 331 F.3d at 74 (quoting  <u>United States v. Valez</u>, 796 F.2d
24, 28 (2d Cir. 1986)).  Most important, however, is the following:

> [T]he doctrine has traditionally been applied to assist
> officers in establishing probable cause -- **not to impute
> bad faith to one member of an enforcement team on the
> basis of another member's knowledge**.  In fact, in <u>Valez</u>,
> we clearly stated that this doctrine **cannot be used to
> impute to an officer "facts known to some [other] members
> of the police force which exonerate an arrestee**."
> [<u>Valez</u>, 796 F.2d at 28].  In addition to our holding in
> <u>Valez</u>, common sense dictates that the collective
> knowledge doctrine cannot be applied in the circumstances
> presented here:  Certainly, one cannot establish that an
> officer engaged in "conduct undertaken in bad faith,"
> [internal citation omitted], **simply by presenting
> evidence of another officer's knowledge or state of mind**.

<u>Savino</u>, 331 F.3d at 74 (emphasis added).  The United States Court
of Appeals for the Second Circuit has made it clear that the

collective knowledge doctrine does not apply in the way that the plaintiff attempts to invoke it.  The plaintiff here seeks to use the doctrine to impute the knowledge of some, if any, of the officer defendants to the police department in order to demonstrate their bad faith conduct.  That conduct in this case is the participation in and furtherance of Dunn's alleged conspiracy to violate the plaintiff's civil rights.  The plaintiff has presented no evidence that shows that the officer defendants all knew of the contract dispute, or that Dunn informed them of the same for purposes of his alleged conspiracy.  Therefore, as made clear in Savino, the doctrine does not apply in circumstances like those that exist in this case.

In sum, the plaintiff must satisfy the following elements to prevail on his § 1983 conspiracy claim: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Pangburn, 200 F.3d at 72 (internal citations omitted).  Merely providing conclusory allegations that a private actor "acted in concert with a state actor, however, does not suffice to state a § 1983 claim" against the private actor. Ciambriello, 292 F.3d at 324 (citing Spear, 954 F.2d at 68).  Based on the record and the filings of the parties, the plaintiff has not met his burden.  At a minimum, the plaintiff has failed to

establish at least an agreement or "meeting of the minds" among the defendants.   Relying on conclusory allegations, as the plaintiff has done here, does not satisfy the necessary elements for his claim.   Furthermore, he has not shown that genuine issues of material fact exist.   Therefore, defendant James Dunn's motion for summary judgment is GRANTED.

B.   <u>Motion for Summary Judgment by Officer Defendants</u>

The remaining motion at issue is the officer defendants' motion for summary judgment.   ECF No. 147.   In their motion, the officer defendants contend that qualified immunity applies with respect to the plaintiff's arrest.   Further, they assert that Fox had probable cause to arrest the plaintiff, and that insufficient evidence exists to support the plaintiff's false arrest and conspiracy claims.   The plaintiff argues that the officer defendants are not entitled to qualified immunity, and that the collective knowledge doctrine applies.   Moreover, the plaintiff believes that his conspiracy claim and false arrest claims present genuine issues of material fact.

1.   <u>Conspiracy Claim</u>

This Court previously addressed the plaintiff's conspiracy claim as to defendant Dunn's motion for summary judgment.   After analyzing each officer defendant's relationship with defendant Dunn in light of the record, this Court determined that no such conspiracy existed.   That same reasoning and those findings equally

apply to the officer defendants' motion for summary judgment.  For
the reasons stated earlier in this memorandum opinion and order, no
genuine issues of material fact exist as to the plaintiff's
conspiracy claim.  Thus, the officer defendants' motion as to the
conspiracy claim must be granted.

2.  <u>False Arrest Claim</u>

The plaintiff's remaining claim is for false arrest by the
officer defendants.  The officer defendants argue that qualified
immunity applies, and that they had probable cause to arrest the
plaintiff.  This Court will first address the application of
qualified immunity, and then turn to the merits of the claim.  As
will be discussed below, the officer defendants are entitled to
qualified immunity.  Even if qualified immunity did not apply, the
officer defendants had probable cause to arrest the plaintiff.

a.  <u>Qualified Immunity</u>

The Supreme Court of the United States has held that
"government officials performing discretionary functions generally
are shielded from liability for civil damages insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>see</u>
<u>McCardle v. Haddad</u>, 131 F.3d 43, 50 (2d Cir. 1997).  Qualified
immunity shields government officials "from liability for civil
damages if their actions were objectively reasonable, as evaluated

in the context of legal rules that were clearly established at the time." Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002). It should be noted, however, that qualified immunity serves as "'an immunity from suit rather than a mere defense to liability.'" Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted). The defense of qualified immunity is available only to an official sued in his individual or personal capacity, and not to an official sued in his official capacity. Kentucky v. Graham, 473 U.S. 159, 165-68 (1985).

Under Saucier v. Katz, 533 U.S. 194, 201 (2001), an analysis of a qualified immunity defense requires a two-part inquiry. The first question is whether the facts alleged, when viewed in the light most favorable to the injured party, "show the officer's conduct violated a constitutional right." Id. If the facts alleged fail to make this showing, the inquiry is at an end, and the official is entitled to summary judgment. Id. If, however, the facts alleged do show a constitutional injury, the second question is whether the constitutional right was clearly

34

established at the time of the violation.  <u>Id.</u>  Accordingly,
qualified immunity is abrogated only upon a showing that the
officer's conduct violated a constitutional right and that such
right was clearly established at the time the conduct occurred.
<u>Id.</u>; <u>Hill</u>, 737 F.3d at 321.  To determine whether a right is
"clearly established in a qualified immunity case, 'the contours of
the right must be sufficiently clear that a reasonable officer
would understand that what he is doing violates that right.'"
<u>Hill</u>, 727 F.3d at 321 (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 615
(1999)).

Within the context "'of a qualified immunity defense to an
allegation of false arrest, the defending officer need only show
"arguable" probable cause.'"  <u>Caldarola v. Calabrese</u>, 298 F.3d 156,
162 (2d Cir. 2002) (quoting <u>Martinez v. Simonetti</u>, 202 F.3d 625,
634 (2d Cir. 2000)).  "Probable cause to arrest exists when the
authorities have knowledge or reasonably trustworthy information
sufficient to warrant a person of reasonable caution in the belief
that an offense has been committed by the person to be arrested."
<u>Golino v. City of New Haven</u>, 950 F.2d 864, 870 (2d Cir. 1991)
(citing <u>Dunaway v. New York</u>, 442 U.S. 200, 208 n.9 (1979)).  As
stated by the United States Court of Appeals for the Second
Circuit, "[a]n arresting officer is entitled to qualified immunity
from a claim for unlawful arrest if 'either (a) it was objectively
reasonable for the officer to believe that probable cause existed,

35

or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Wachtler v. County of Herkimer, 35 F.3d 77, 80 (2d Cir. 1994) (quoting Golino, 950 F.2d at 870). "In order to be entitled to summary judgment on such a defense, the officer must adduce sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the officer to believe that probable cause did not exist." Golino, 950 F.2d at 870.

Using the analysis provided under Saucier, it is clear that the officer defendants' conduct, particularly Fox's conduct, did not violate a constitutional right because probable cause existed. It is true that the "right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." Id. The record shows, however, that probable cause did exist. Here, Fox received a voluntary statement from Galindo, which Galindo provided on his own accord, with only Fox present. In that statement, the elements of tampering in the fourth degree[10] are listed, as well as the following statement of

---

[10]The elements for tampering with a witness in the fourth degree are the following: "A person is guilty of tampering with a witness when, knowing that a person is or is about to be called as a witness in an action or proceeding, (a) he wrongfully induces or attempts to induce such person to absent himself from, or otherwise to avoid or seek to avoid appearing or testifying at, such action or proceeding, or (b) he knowingly makes any false statement or practices any fraud or deceit with intent to affect the testimony of such person. Tampering with a witness in the fourth degree is

facts by Galindo:  "McGee calls me around 11 p.m.  I think he try to scare me.  If I go to the court to testify because he ask me if I was citizen or legal in USA."  ECF No. 152 Ex. 8.  Nothing in the record indicates that the officer defendants should have viewed Galindo's statements as untrustworthy.  Rather, comparing the statement of Galindo to the elements of the statute created a reasonably trustworthy belief, at the time of arrest and immediately before it, that the plaintiff committed an offense.  See Caldarola, 298 F.3d at 162 (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996) ("When determining whether probable cause exist courts 'must consider those facts available to the officer at the time of arrest and immediately before it.'").

It does not matter that the charge was later dismissed.  As the Supreme Court of the United States stated in Michigan v. DeFillippo, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."  443 U.S. 31, 36 (1979).  Therefore, it was objectively reasonable for the officer defendants to believe that probable cause existed, and thus, they are "entitled to qualified immunity."  Wachtler, 35 F.3d at 80.  Because the facts, "viewed in the light most favorable to

---

a class A misdemeanor."  N.Y. Penal Law § 215.10 (McKinney 2015).

37

the injured party," show that the officer defendants did not violate a constitutional right, "the inquiry is at an end, and the official is entitled to summary judgment." <u>Saucier</u>, 533 U.S. at 201. Thus, the officer defendants are entitled to qualified immunity.

> b. <u>Merits of the False Arrest Claim</u>

This Court now turns to the merits of the plaintiff's false arrest claim. As found in the complaint, the plaintiff alleges that he was falsely arrested by the officer defendants, in violation of his Fourth Amendment rights. The United States Court of Appeals for the Second Circuit has stated that a "§ 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest with out probable cause . . . is substantially the same as a claim for false arrest under New York law." <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). A false arrest claim maintains the following elements: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 118 (2d Cir. 1995) (internal citation omitted). Phrased another way, New York law requires a plaintiff who asserts a claim of false arrest to show "that the defendant intentionally confined him without his

consent and without justification." Weyant, 101 F.3d at 852. Probable cause, if it exists, establishes such justification, and operates as a "complete defense to an action for false arrest . . . whether that action is brought under state law or under § 1983." Id. (internal citations and quotations omitted). As stated earlier, probable cause exists "when the arresting officer has "'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993) (quoting Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989)). Ordinarily, "subjective intentions play no role in . . . probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996).

In this case, the facts show that defendant Fox, and the officer defendants collectively, had probable cause to arrest the plaintiff. As discussed above, Galindo went to the police department on his own accord to give a voluntary statement. That statement contained the elements of the tampering charge, as well as Galindo's handwritten statement. The plaintiff argues that the voluntary statement lacked a specific date, which allegedly raises issues about the statement's credibility. Under the statement, however, it provides "Nov. '06" as the date of the phone call to Galindo by the plaintiff. ECF No. 152 Ex. 8. Although the

statement does not contain an exact date, the relevant penal code maintains no such requirement.  It is worth noting that Galindo's statement about the phone call in the voluntary statement align with those Galindo swore to in his affidavit.  See ECF Nos. 152 Ex. 8 and 135 Ex. I.  Although the existence of probable cause was properly based on the voluntary statement by Galindo, the fact that such statement mirrors his statements under his affidavit further supports the trustworthiness of the information relied on by Fox.

To the extent that the plaintiff relies on the collective knowledge doctrine, such argument also lacks merit.  As discussed earlier, the doctrine applies when, "for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all.'"  Savino, 331 F.3d at 74 (quoting Andreas, 463 U.S. at 772 n.5).  The purpose behind the doctrine is that "'in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates.'"  Savino, 331 F.3d at 74 (quoting Valez, 796 F.2d at 28).  However, as this Court quoted above, "the doctrine has traditionally been applied to assist officers in establishing probable cause -- **not to impute bad faith to one member of an enforcement team on the basis of another member's knowledge**."

40

Savino, 331 F.3d at 74 (emphasis added).  The United States Court of Appeals for the Second Circuit has made it clear that the collective knowledge doctrine does not apply in the way that the plaintiff attempts to invoke it as to the officer defendants.  The plaintiff has not shown that any of the officer defendants, let alone Fox, acted in bad faith.  The plaintiff also has not shown that any of the officer defendants possessed knowledge that the plaintiff's arrest would occur or be arranged in bad faith.  Notwithstanding the Second Circuit's position on the use of the collective knowledge doctrine, the plaintiff has established no evidence that any of the officer defendants acted in bad faith.

More importantly, the plaintiff has pointed to no evidence that meets the standard for a false arrest claim described above.  The plaintiff instead relies on conclusory allegations that do not raise doubts as to the reliability or trustworthiness of either Galindo or his voluntary statement.  The record shows that at the moment of arrest and immediately before it, Fox reasonably believed that the plaintiff committed an offense.  Therefore, this Court finds that probable cause existed, and accordingly, the officer defendants' motion for summary judgment is GRANTED.

## V.  Conclusion

For the reasons set forth above, defendant James Dunn's motion for summary judgment (ECF No. 143) is GRANTED.  Further, defendants Robert Bagnarol, Michael Cazzari, Christopher Fox, John (Jack)

41

Harney, Michael R. Johnson, and Brian Karst's motion for summary judgment (ECF No. 147) is GRANTED.  Accordingly, the pretrial conference and trial in this civil action are VACATED.  It is further ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:   December 16, 2015

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE

42